**SC94720**

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# IN THE
## SUPREME COURT OF MISSOURI

| | | |
|---|---|---|
| In Re: MARCELLUS WILLIAMS, | ) | |
| | ) | **CAPITAL CASE** |
| Petitioner, | ) | **Execution Set for** |
| | ) | **January 28, 2015** |
| v. | ) | **At 12:01 a.m.** |
| | ) | |
| TROY STEELE, Superintendent, | ) | Case No. _____ |
| Potosi Correctional Center | ) | |
| | ) | |
| Respondent. | ) | |

---

## PETITION FOR A WRIT OF HABEAS CORPUS

---

## EXHIBITS IN SUPPORT OF PETITIONER'S
## PETITION FOR A WRIT OF HABEAS CORPUS

---

KENT E. GIPSON, Mo. Bar #34524
LAW OFFICE OF KENT GIPSON, LLC
121 East Gregory Boulevard
Kansas City, Missouri 64114
816-363-4400 / fax 816-363-4300
kent.gipson@kentgipsonlaw.com

LAURENCE E. KOMP, Mo. Bar #84430
E.D. Mo. No. 5212907
P.O. BOX 1785
Manchester, MO 63011
636-207-7330 / fax 636-207-7351
lekomp@swbell.net

*COUNSEL FOR PETITIONER*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

## List of Exhibits

Exhibit 1 . . . . . . . . . . . . . . . . . . . . . . . . Police Report Re: Debra McClain Murder

Exhibit 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . John Duncan Affidavit

Exhibit 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . Kimber Edwards Affidavit

Exhibit 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . Johnifer Cole Griffin Affidavit

Exhibit 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Durwin Cole Affidavit

Exhibit 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ronnie Cole Affidavit

Exhibit 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . Edward Hopson Affidavit

Exhibit 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Walter Hill Affidavit

Exhibit 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Latonya Hill Affidavit

Exhibit 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . Joseph Green Affidavit

Exhibit 11 . . . . . . . . . . . . . . . . . . Letter to Robert McCulloch Re: DNA Testing

Exhibit 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2001 Judgment and Sentence

Exhibit 13 . . . . . . . . . . . . . . . . . . . . . . . . Excerpts from Henry Cole Deposition

Exhibit 14 . . . . . . . . . . . . . . . . . . . . . . . Excerpts from Laura Asaro Deposition

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 1

*Police Report Re: Debra McClain Murder*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

| DEPARTMENT REPORTING University City | CODE 85 | | SUPPLEMENTARY INVESTIGATIVE AND/OR DISPOSITION REPORT | DEPT. FI. NO. 98-8237    OCN: 98-7690 |
|---|---|---|---|---|
| | | | | ORIGINAL UCR CLASSIFICATION Homicide |
| DIVISION BOI | PRECINCT 3 | COGIS 204.3 | | CERTIFIED AS: (XX)ACTIVE( )CLEARED BY ARREST( )UNF ( )INACTIVE( )EXCEPTIONALLY CLEARED |
| DATE/ORIGINAL REPORT 08-11-98 | DAY OF WEEK Tues. | | | RECLASSIFICATION (IF APPLIES) |
| DATE/TIME, THIS REPORT 08-26-98    1145 | DAY OF WEEK Wed. | | | |

| VICTIM/COMPLAINANT (BUSINESS) Gayle, Felicia Anne | RESIDENCE ADDRESS 6946 Kingsbury | RES. PHONE 721-7933* |
|---|---|---|
| | PLACE OF OCCURRENCE 6946 Kingsbury | |

*Please note, the victim's telephone number listed on the original report is incorrect. This number is the corrected number.

On Thursday morning, 08-20-98, at 1100 hrs., I responded to the St. Louis County Medical Examiner's Office and there met with Chief Medical Examiner Dr. Mary Case, M.E.'s Chief Investigator Terry Ledbetter, Det. Lt. John Belmar (St. Louis County P.D.) and Det. Nancy Cadenhead (St. Louis County P.D.). Dr. Case had called the meeting to discuss the possible connection between our case and the Pagedale P.D. stabbing death of Mrs. Debra McClain (Pagedale Police Report #98-5579, 07-18-98).

After reviewing the scene photos, M.E. reports and police reports from both investigations, Dr. Case was struck by the similarity of both cases. She commented on:

        a.  age of the victims (McClain was 40, Gayle was 42),
        b.  similarity of build (both petite white women with large breasts and long brown hair),
        c.  injuries (both stabbed on right side of neck, numerous stab wounds on front and back upper trunk area),
        d.  similarity of crime scene (very little disturbed, victim stabbed with knife from her own kitchen drawer, purses missing from both houses, knife left in victims' right side head or neck)
        e.  proximity of crime scenes
        f.  both victims had defensive wounds (Gayle had more defensive injuries than McClain)

Dr. Case was especially concerned with the unusual factor of the victim being found with the knife still in her body. She noted this aspect of a stabbing death is extremely rare. Dr. Case has alerted her staff to notify her in the event of any stabbing death and Mr. Ledbetter has advised his investigators to notify St. Louis County P.D. in the event of any victim who is found dead from apparent stab wounds with the knife still in the victim. He stated via his association with the St. Louis City Medical Examiners Office, they have been requested to advise him in the instance of any similar homicide.

I then returned to the station and contacted Ms. Patty Teichgraeber, Dr. Picus' assistant, and advised her I would be responding to the hospital to speak to him. She advised he was called back to surgery but was expected in his office shortly and would be in his office the remainder of the afternoon. Ms. Teichgraeber advised she had been contacted by Det. Glickert the previous afternoon and had the documentation he had requested of Dr. Picus' activities on Tuesday, 08-11-98. I advised her I would pick that up upon my arrival.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

| DEPARTMENT REPORTING | | DEPARTMENT FILE NO. |
|---|---|---|
| University City P.D. | CONTINUATION | 98-8237 |
| DATE OF THIS REPORT | FORM | |
| 08-26-98 | | PAGE 2 |
| VICTIM OR COMPLAINANT | PLACE OF OCCURRENCE | |
| Gayle, Felicia Anne | 6946 Kingsbury | |

Det. Poteet and I then responded to the hospital and there contacted Dr. Picus at 1355 hrs. I showed him Polaroid photographs of the clothing located early that morning at 5629 Vernon. He viewed the clothing but could not identify it as belonging to his wife or that he had ever seen the clothing previously.

I advised Dr. Picus that the Crime Lab had observed semen during their examination of the rape kit contents seized from Ms. Gayle's body at the time of the postmortem procedure. I asked Dr. Picus when he had last had sexual contact with Ms. Gayle. He advised he had been attempting to recall the events of the weekend and believed he had sex with his wife on Friday or Saturday. He did not think they had sex on Sunday (08-09-98) or Monday (08-10-98). Dr. Picus consented to having his blood drawn for comparison. He then summoned:

                     Kathy Friederich, RN
                     W/F  H.Ph. 618-234-1929
                     Nurse Manager for Radiology,

to his office and asked her to draw a lavender-topped tube of blood for us. Ms. Friederich did so at 1425 hrs. and this was witnessed by Det. Poteet and this officer. I seized the blood from Ms. Friederich and tagged it into evidence, #55861.

As there was a possibility of the victim's being sexually assaulted, I obtained permission from Dr. Picus to accompany Crime Lab personnel into his residence to conduct tests on the premises using the "luma-light". I advised him there were possible carpet fibers observed on the recovered clothing and we may have to seize samples from the carpets in the house. As the locks had been changed, he gave me his house key and permission to search the house and seize any evidence if necessary.

While we were at the hospital, Dr. Picus provided us with documentation of his surgical procedures of Tuesday, 08-11-98. He advised that because of patient confidentiality, he should not be releasing the information without a subpeona. I advised him I would not make copies of the information, but would tag them into evidence. I later tagged the paperwork into evidence, #55918.

Det. Poteet and I then conveyed the blood sample to the St. Louis County Crime Lab and surrendered the vial to them for comparison to the semen found in the victim's rape kit. Forensic Scientists Margaret Walsh and William Dean accompanied us to the victim's residence and there conducted tests with their luma-light which did not reveal any significant areas of dried bodily fluids. However several spots were observed and tests were conducted on these spots to determine their origin. Carpet fibers were seized by Walsh and Dean from the carpets in the residence.

That evening, Dr. Picus responded to the station to recover his house key and I interviewed him further reference to the sexual activity with his wife. He advised that he had been trying to recall their activities over the weekend and advised that Friday evening, 08-07-98, after he had gotten home from work, they ate dinner. They went out and purchased a modem for the computer and returned home about 2100 hrs. He believes they had sex that night.

On Saturday, 08-08-98, Dr. Picus worked at the hospital from about 0800 until 1500. He came home and took a nap and he believes they had sex that

168

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

| DEPARTMENT REPORTING<br>University City P.D. | CONTINUATION<br>FORM | DEPARTMENT FILE NO.<br>98-8237 |
|---|---|---|
| DATE OF THIS REPORT<br>08-26-98 | | PAGE 3 |
| VICTIM OR COMPLAINANT<br><br>Gayle, Felicia Anne | PLACE OF OCCURRENCE<br><br>6946 Kingsbury | |

afternoon. They walked to Brandt's for dinner and then saw a movie at the Tivoli. They walked home and installed the modem before going to bed.

On Sunday, 08-09-98, Dr. Picus stated he mowed the lawn and then went to work about 0930 or 1000. He stated early that afternoon, Lisha took the bus to the Metrolink and met him at the hospital. They then went to the Cardinal baseball game with his brother and sister-in-law, Joel and Sue Picus. After the game, they went to Joel's for dinner and returned home. He stated Lisha went to bed "early", about 2100-2130 hrs.

He stated Monday was a work day for him with nothing unusual about their schedules. I then returned his house key to him and he advised he could provide us with a key if necessary.

At about 2110 hrs. on Thursday evening, I was contacted by Forensic Scientist Alan Derickson of the St. Louis County Crime Lab and advised that the blood found on the clothing seized that morning from 5629 Vernon did not match the victim's blood.

On Friday afternoon, 08-21-98, at 1645 hrs., I was contacted by Margaret Walsh of the Crime Lab and advised that she had conducted tests on Dr. Picus' blood and determined that the victim and her husband have the same enzyme type and it is impossible to say that the semen found in the rape kit was his. She advised the DNA will have to be determined from the respective samples before a scientific answer can be given to the question of his being the donor.

Attached to this report is the lab report on the specimens seized from the victim during the autopsy.

On Friday afternoon, 08-21-98, Det. Paul Glickert and I conveyed the following evidence packages back to Brian Cooper's residence, 6947 Roberts and released them to his mother, Carline McKinney:
#55756, #55754 and #55769.

Investigation to continue.

Officer's Signature & Dsn
Det. Dorothy Dunn   298

Approved by

Reference Number(s)

169

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 2
*John Duncan Affidavit*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

## IN THE CIRCUIT COURT IN AND FOR THE COUNTY OF ST. LOUIS
## STATE OF MISSOURI

MARCELLUS WILLIAMS,                            )
                                               )
      Movant,                                  )
                                               )
                                               ) PCR No. _____
v.                                             )
                                               ) Division No. 11
STATE OF MISSOURI,                             )
                                               ) Hon. Emmett O'Brien, Judge
      Respondent.                              )


STATE OF MISSOURI        )
                         ) ss
COUNTY OF RANDOLPH       )


### AFFIDAVIT

I, John Duncan, being first duly sworn upon oath, do depose and state as follows:

1. I am currently incarcerated at the Moberly Correctional Center, Moberly, Missouri;

2. When I was in the workhouse with Marcellus, I saw him daily. We played cards together every evening and played basketball together every couple of days.

3. Matthew Hose also played cards with us. During this time, Marcellus never discussed his case with anyone. He never talked about anything personal. Matthew could not have talked to Marcellus about his case on other occasions, because they were

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

only together when we were playing cards. Otherwise, Matthew was in his cell. Marcellus was never alone with Matthew.

4. Marcellus is not the type of person to discuss his personal matters or his case. He is a smart, quiet, laid back person who is seriously into his religious beliefs. He also spent his time trying to help other inmates with their cases. He is not the kind of guy to confess to others that he committed a crime.

5. Matthew Hose would have done anything to get out of jail. He was suicidal. During the time I was in the workhouse, Matthew tried to commit suicide on four to five occasions by slitting his wrists. Matt wanted to go home to his girlfriend and new baby. He would do anything to get there.

6. I pled guilty to a case in St. Louis City. I was charge with Assault First Degree, Felonious Restraint, and Sexual Assault. I was sentenced to 15 years and 2 years consecutively.

7. After I was sentenced and sent to the Moberly Correctional Center, Ed Magee, an investigator from the St. Louis County Prosecuting Attorney's office, came to Moberly in interview me. He told me that he knew that Marcellus had broken into a woman's house, stabbed her numerous times, and pawned a laptop to get drugs. He tape-recorded our conversation. He asked me if Marcellus had ever discussed this crime with me and advised me that Matthew Hose had told the State that Marcellus had given him details about the murder. I advised the State that Marcellus never said anything to me

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

about any crime. I also told them that Matthew Hose could not have heard any of that information from Marcellus, as Matt Hose was always in his cell. He stayed up all night and slept all day. Matt and Marcellus were never together alone. Mr. Magee left me his card and told me to call him if I thought of anything. He told me that he could help me reduce my sentence if I provided him with information against Marcellus.

8. Later, I received a letter from Marcellus' lawyers asking me to contact them. I did so. I do not know who I spoke with. I never spoke to either of his attorneys face to face.

9. I was transported to St. Louis County during Marcellus' trial. I was never certain who had writted me in. The night before trial, someone came to visit me. I was told that he was an investigator from Marcellus' defense team, but I was not certain. Shortly after that interview, I was sent back to Moberly. No one ever explained to me why I had been brought in or who or why I was being sent back.

10. I was present during the attempted escape at the St. Louis City Workhouse with which Marcellus was charged. Marvin Jones, Quentin Davis, and Marcellus were also present. Marcellus never had the pipe in his hand and never attempted to assault anyone. Quentin was the person wielding the pipe. When everything went down, Marcellus and I left the area.

11. If Marcellus' attorneys had called me, I was ready, willing, and available to testify to the information contained in this Affidavit.

12. Further, Affiant sayeth naught,

_John Duncan_    8-19-03
JOHN DUNCAN

SUBSCRIBED and SWORN to before me this 19th day of August, 2003.

_____
NOTARY PUBLIC

LYLE BALES
Notary Public – Notary Seal
State of Missouri
County of Randolph
My Commission Expires Sep 19, 2004

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 3
*Kimber Edwards Affidavit*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

## IN THE CIRCUIT COURT IN AND FOR THE COUNTY OF ST. LOUIS
## STATE OF MISSOURI

| | |
|---|---|
| MARCELLUS WILLIAMS, | ) |
| | ) |
| Movant, | ) |
| | ) PCR No. _____ |
| v. | ) |
| | ) Division No. 11 |
| STATE OF MISSOURI, | ) |
| | ) Hon. Emmett O'Brien, Judge |
| Respondent. | ) |

| | |
|---|---|
| STATE OF MISSOURI | ) |
| | ) ss |
| COUNTY OF WASHINGTON | ) |

### AFFIDAVIT

I, Kimber Edwards, being first duly sworn upon oath, do depose and state as follows:

1. I currently reside at the Potosi Correctional Center in Mineral Point, Missouri.

2. I was arrested on August 27, 2000 for the crime to which I am currently incarcerated. I was taken to the University City Police Department.

3. Detective Dorothy Dunn spoke to me after I was taken to University City on that same date. She told me that she could help me on my case if I would testify against another individual, Marcellus Williams. She immediately began providing me with facts

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

about Felicia Gayle's murder. I had no previous knowledge of the case. As she provided me with the details, she continually asked me, "Would you want a person who committed a crime like this out on the street?"

4. Detective Dunn knew that I had been hired as a guard at the St. Louis City Workhouse. She wanted to me to testify that, during my employment at the workhouse, I had overheard a conversation between Marcellus Williams and another inmate at the workhouse. I cannot recall the name of the other inmate, although Detective Dunn provided me with that information. The contents of the conversation were to be that Marcellus Williams confessed his guilt in the Felicia Gayle murder to the other inmate and provided details of the homicide.

5. Detective Dunn advised me that if I cooperated with them on Marcellus Williams' case, they would not arrest my wife, would ensure that I was released on bond, and promised that I would get a deal on my case.

6. I advised Detective Dunn that, although I was employed by the St. Louis City Workhouse during the time in question, I was off on Workman's Compensation.

7. Additionally, I told her that, during the course of my employment, I worked primarily at the St. Louis City Jail instead of the Workhouse and, on those occasions that I was working in the Workhouse, I was on tower duty and not in the facility. My last day that I was actively working for the St. Louis City Department of Corrections was early August, 1998.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

8. This did not seem to matter to her. She said that the defense would never check on that. She continued to insist that if I agreed to give this testimony, I could be given a break on my own case. I declined to give false testimony in order to help myself.

9. I also advised her that, to my knowledge, I had never had any contact with Marcellus Williams. I had never met him and knew nothing about him. Since I have been incarcerated in the Potosi Correctional Center, I have been in Protective Custody and have had no contact with Marcellus Williams or any other general population inmate.

10. Marcellus Williams' attorneys did not contact me at any time. If they had, I was ready, willing and available to provide them with the above information and to testify to the same at his trial.

11. Further, affiant sayeth naught.

_____
KIMBER EDWARDS

SUBSCRIBED and SWORN to before me this 21st day of August, 2003.

_____
NOTARY PUBLIC

LINDA EDGAR
Notary Public - Notary Seal
STATE OF MISSOURI
WASHINGTON COUNTY
MY COMMISSION EXP. AUG. 24, 2003

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 4
*Johnifer Cole Griffin Affidavit*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

IN THE CIRCUIT COURT IN AND FOR THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

MARCELLUS WILLIAMS SR.          )
                                )
              Movant,           )
                                )
                                ) PCR No. CR695-1441FX
v.                              )
                                ) Division 11
STATE OF MISSOURI,              )
                                ) Hon. Emmett O'Brien, Judge
              Respondent.       )


STATE OF MISSOURI          )
                           ) ss.
COUNTY OF ST FRANCOIS      )

## AFFIDAVIT

I, Johnifer La'Royce Griffin (Cole), SS # 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, being first duly sworn upon oath, do depose and state as follows:

1. My father, Henry Cole, has been a liar, a con-man and a criminal his entire life. He is a violent, diabolical, stone-cold killer, and is not to be believed or trusted;

2. I was born on June 28, 1966 in St. Louis, Missouri.

3. Henry Cole is my father and Daryl Ann Easter (nee Griffin) was my mother. My parents were never married.

4. They had one other child together, Bridgette Griffin. I have a half-brother, Lawrence through my dad. Lawrence is 39 years old and works as a shoe shine guy at the airport.

I

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

5. My mother was a heroin addict at the time of my birth. I have a brother who was born in the Tipton Correctional Facility. My mother died in 1996 from a heroin overdose,

6. My parents, particularly my father, were always involved in criminal activity and introduced me to crime.

7. In 1968, my father, his sister, Erma Jean Cole Anderson, and their friends, Bubble Bryson and Gino Anderson committed a robbery together in St. Louis County. After the crime, they were involved in a high-speed chase. The St. Louis County police were pursuing them when the driver lost control of the vehicle and rolled it. All of the participants were killed except my father. My father received probation on the charges,

8. When I was 5 or 6 years old, my parents often took me to stores boosting (stealing). They took me to the department stores, like Stix, Baer and Fuller, and Famous-Barr, where they regularly went stealing in the 1970's. My mother was a heroin addict and stole to support her drug addiction and for survival. My father committed robberies and burglaries because he thought criminal activity was more noble than begging.

9. When my parents were together, they had a very volatile and violent relationship. My father beat my mother frequently and brutally. Although Henry never physically abused me, I was terrified of him. I knew what he was capable of and did not

2

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

want to offend him for fear of the consequences. I witnessed his violence throughout my life.

10. Both of my parents spent time in prison when I was young. As a result, I was often raised by my grandmother. Whenever my mother got out of prison, I again lived with her. Even after my parents split up, I saw my father often, generally to assist him in committing crimes.

11. Henry spent time in prison in the early 1970's. He was in the federal prison at Leavenworth, Kansas in approximately 1970 until 1972 or 1973. He was out briefly in 1974 and/or 1975. He went to state prison in 1975 for armed robbery. He spent other times in prison, though I am uncertain of the dates.

12. I don't believe my father ever cared about me. The only time I ever received anything from him was when he sent me toys and gifts from prison. He was just a con-man and the only time he came around was because he needed me as a partner in crime. He got angry if I did not want to participate in the crimes he planned.

13. Henry was always extremely violent. He always had a lot of guns and favored sawed-off shotguns because they could not be traced. He shot others and was shot on a number of occasions. If someone looked at Henry wrong, he went crazy on them. In approximately 1975, he shot a girlfriend in front of our house on Alcott in North St. Louis. On another occasion, I recall Henry running up the street and some guys were shooting at him. He was hit in the finger by a bullet and fell through the front door.

3

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

14. When I was 14, Henry took me along with him to do a hit. He was angry at a security guard and took a gun to kill him. We went to where the security guard worked but he was not there. We then went to a neighborhood bar where he frequented, but he was not there. Had he been there, I know my dad would have killed him.

15. In the late 1960's or the early 1970's, Henry committed the first murder that I know about. He was charged with robbing and killing a man at a Laundromat on Dryer and Lee in the City of St. Louis. His girlfriend and her mother lived over the laundromat. The case went to trial and Henry was acquitted because both his girlfriend and her mother testified that he was with them at the time of the murder. I know that Henry was guilty of committing that murder, even though the jury found him not guilty.

16. Henry killed James Cook in the 4900 block of Alcott during a robbery. I knew that Henry was good for the murder. Both Henry and I were locked up for the murder. I spent three or four days in juvenile. Henry was locked up in the City Jail for three or four months. There were no witnesses to the crime and the police never found the murder weapon. The charge against Henry was eventually nolle prossed due to lack of evidence. By the time Henry got out of the City Jail, I had been locked up in the Missouri Hills Juvenile facility.

17. He also committed a murder in a McDonald's on Delmar and Goodfellow during a robbery.

4

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

18. When I was a teenager, Henry taught me how to commit "Smash and grab" robberies. On one occasion in 1981, he wanted me to commit a "smash and grab" at the jewelry department in Famous-Barr. I did not want to do it. Henry got mad and moved to Pennsylvania.

19. Later in my teen years, Henry and I committed robberies together often. In the mid-1980's, I got caught with my father and two other guys for committing a robbery. Two other guys were in the car. We were stopped, arrested and spent 20 hours in jail. The victims were unable to identify us. The 9th District Police Officers tried to beat statements out of us. Instead, Henry snitched on the other two guys. One of the men got sentenced to two seven-year and one three-year terms. The other man was not convicted of the crime. However, he was out on probation and his probation was revoked and he was returned to the penitentiary.

20. In the 1980's, my father also got charged with tampering with a witness on a case he was on with Gerald King. The witness, Gene Lane, was locked up on an assault or other charge. My father and some other guy were sent to beat him up and he was charged with tampering.

21. For about six months in 1988 or 1989, my dad and I were locked up together in Farmington for about six months.

22. In 1989, my father was an informant in a case against me. I had just gotten out of prison and Henry took me with him to his girlfriend, Francis Martell's, house in North

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

St. Louis. His girlfriend and another girl were there. They had some jewelry. They gave me a van and told me to go sell the jewelry. Henry called the police and reported the van stolen. Henry and the woman concocted a story that I had robbed her at a phone booth at Kingshighway and Lillian and stolen the van. None of that information was true. Henry had to have provided her with my name, because Francis knew me only by my nickname, "Cup."

23. Henry used drugs off and on during his life. In the 1960's and 1970's, he used to use splash and heroin. He stopped using drugs in 1975 and did not use at all during the 1980's. He began using crack in the early 1990's. He always used alcohol. He was crazy, aggressive and assaultive when he was intoxicated. It did not take more than a couple beers for Henry to get wild and mean. He committed crimes on the spur of the moment. Alcohol completely changed his personality and his behavior. When he drank he became a "monster".

24. My mother was a heroin addict for as long as I knew her. She overdosed on many occasions. She used to get high and clean my ears. She laid me on her lap and dug in my ears with q-tips. To this day, I still have problems with my ears. My mom got out of prison in 1986 and three weeks later died from a heroin overdose.

25. In the early 1990's when Henry began using crack, he became quickly addicted. He committed crimes to support his drug habit. Additionally, he applied for

6

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

and received disability. Previously, Henry believed that there was much more prestige in crime than in being on disability.

26. Henry began receiving treatment at the Hopewell Clinic in St. Louis when he applied for S.S.I. I know he was granted disability for mental illness, rather than drug use. I believe that obtaining disability was part of a scam perpetuated by Henry, even though he had experienced some emotional and behavioral problems. He became very paranoid on occasion and was looking around constantly. It is also possible that he suffers from depression and anxiety.

27. Henry has no conscience. He would do anything to get what he wanted. He did not care who he hurt along the way. He was not afraid of anything. I do not believe he went to New York because he was afraid of Marcellus' uncles. Henry always told me that he was "not afraid of nothing - just living too long or dying too young,"

28. My father was never afraid of the Hill's and that was not the reason Henry went to New York. He told me that he was going to New York because he was dying of AIDS and did not want to put the family through that. I never believed that. I have since discovered that, although Henry is HIV positive, he does not have AIDS. Throughout his life, my father always ran back and forth to New York whenever something was going on in St. Louis that he was trying to avoid. He has two children who reside in New York.

7

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

28. The Hill's were Christians and crackheads. They would not have come after Henry because he snitched on Marcellus. Although James or Joe Hill were crackheads and had been to prison for stealing and drug possession, neither was ever violent.

29. I have always had mixed feelings about my father. I always cared about him and loved him, but I never thought about him as a father. I was also always afraid of him because I knew that he was a violent, ruthless person. I also knew that he had no conscience and his only loyalty was to himself.

30. While I was in and out of prison, I always heard rumors that Henry was acting as an informant against others, but I tried not to believe it. It did always seem unusual that with his record, he was always getting probation or short prison or jail sentences. When he turned snitch on people I know had not been involved in crimes, I started to believe the stories I had been hearing. When he snitched on me, I knew that Henry was only out to further his own interests and no one else mattered. The truth never mattered either.

31. I was amazed when Henry got arrested for robbing a bank and got 10 years probation. At the time I saw the article in the paper, I wondered who he had to inform on to get a sweet deal like that. During the time Henry and Marcellus were in jail together, I got a letter from Henry indicating to me that he had some kind of caper going on because he said he had "something big coming." I did not know until later that he was talking about the $10,000 reward money offered by the victim's family.

8

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

32. Although Marcellus and I have relatives in common by marriage, we never hung out together growing up. We are not friends or associates.

33. The reason that I came forward and provided the above information is based on an experience that I had while incarcerated at the Potosi Correctional Center. While I was at Potosi, Larry Griffin was executed, an inmate that I absolutely knew was innocent. At that time, I swore that I would do whatever I could to help an innocent man and keep him from being killed.

34. I do not know whether or not Marcellus committed the crime for which he is convicted. I do know, however, that Henry is not to be trusted and that his only motivation for providing information to the police was for the purpose of receiving the reward. He as much as told me this when he wrote to let me know that he had something "big" going on. When Henry told me that something big was going on, this was Henry's way of telling me that he was setting someone up. At the time, I did not know it was Marcellus.

35. I have been at the St. Louis City Workhouse with my father on a number of occasions and know that the St. Louis Post-Dispatch is delivered there every day.

36. Henry is an avid reader, and reads the newspaper, magazines, and is always up on the local news so that he can use the information to fabricate evidence to his own advantage. He is also an excellent con-man and can use information he obtains to his own advantage. He has been an informant and snitch in the past and is motivated to lie.

9

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

36. Further, Affiant sayeth naught.

JOHNIFER COLE (GRIFFIN)

SUBSCRIBED and SWORN to before me this 14th day of August,
2003.

_____
NOTARY PUBLIC

10

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 5

*Durwin Cole Affidavit*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

## IN THE CIRCUIT COURT IN AND FOR THE COUNTY OF ST. LOUIS STATE OF MISSOURI

MARCELLUS WILLIAMS,              )

          Movant,            )

                            ) PCR No. _____

v.                         )

                            ) Division No. 11

STATE OF MISSOURI,         )

                            ) Hon. Emmett O'Brien, Judge

          Respondent.     )

STATE OF MISSOURI     )

                      ) ss

COUNTY OF COLE       )

## AFFIDAVIT

I, Durwin Cole, being first duly sworn upon oath, do depose and state as follows:

1. I am currently incarcerated in the Eastern Diagnostic and Reception Center In Bonne Terre, Missouri;

2. Henry Cole is my maternal uncle. Dexine Gibson is my mother, Henry Cole's sister;

3. Henry Cole lived with my grandmother, Marjorie Cole, on Alcott in the City of St. Louis until she died in 1997. She always took care of him no matter what he did to her. He stole from her all the time, but she would do nothing about it. She refused to put him out even though he stole money from her in order to buy narcotics.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

4. . I know that Henry was on SSI for mental problems. I saw his check on a number of occasions. He received about $500 per month. His check always came a day before mine. He never gave any of his money to grandma. He just bought cars, clothes and drugs with it. He had been prescribed psychiatric medication for his mental problems, but he never took it.

5. . No one in my family except my grandmother wanted anything to do with Henry. Family means nothing to Henry since my grandmother passed away. He didn't even attend her funeral, even though she was the one who always took care of him.

6. After my grandma died, Henry went totally out of control. Everyone in the family was afraid of him because he acted so crazy. He always talked crazy and had severe mood swings. Sometimes I would sit down and talk to him for a minute, then leave. When I came back, he would still be talking even thought there was no one else in the room.

7. On one occasion, I observed Henry looking in the mirror and appeared to be pulling something out of his hair and putting it in a glass. He asked me if I saw bugs in the glass – there was nothing there. If he wanted something and someone was not willing to give it to him, Henry went off on them. He was always violent, particularly when he was on drugs.

8. I learned not to mess with Henry because he is not right. He cares about no one or nothing and everything he has ever done has been hurtful to my family. He would do

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

anything for money. I heard about him committing robberies, stealing, and burglarizing houses.

9. My brother Ronnie and I had a room on the second floor of the house. Henry slept on the first floor on a couch. We put a lock on the door because we did not want Henry coming in and stealing from us. On one occasion when we were gone, Henry kicked the door in and stole a lot of our stuff. When he did something like that, he would disappear for a couple of days doing drugs. When he came back, he would tell us that he would pay us back for the stuff but he never did.

10. On another occasion I left of friend of mine, James, with Henry while I went to the store. When I came back, Henry had taken all of James' money. When I saw Henry later and asked him why he took the money, Henry said because he owed me.

11. Henry stayed with my mother after my grandmother died. My mother, Dexine, and Henry did not get along, but she allowed him to stay there because she was afraid of him. He was violent and unpredictable. She had no control over him. My mother is not a streetwise person and did not know how to handle Henry other than letting him stay there and staying out of his way.

12. Dexine was also afraid because of all the bullet holes in our house. Henry frequently shot at people out of the house and people would drive by and retaliate, shooting into the house. When I got out of prison, I tried to get my mother to throw him out because he was so crazy, you never knew what he might do. When she wouldn't

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

throw him out, I left and went to live somewhere else. I started living with a cousin on the South Side. I wanted to avoid trouble, and trouble followed Henry everywhere he went..

13. Henry has always been a liar and not a reliable person. He lies to get whatever he needs to satisfy his personal needs. Whenever he can't find a good scam or someone to lean on, he leaves town. Everyone in the family knew that Henry made up the story about Marcellus committing the Felicia Gayle homicide. Henry made it up because he wanted the money and wanted to leave town and go to New York.

14. Although everyone in the family knew that he was lying on Marcellus, we were too afraid to go the police about it. My mom and sister were afraid that if they told law enforcement, Henry would make up a case on them. I thought about going to the police, but I had just gotten out of prison, and I was not anxious to talk to the police.

15. I also knew that Henry was lying when he said he was afraid of the Hill family, Marcellus Williams' family members. Henry was never afraid of anything. He would never run from anybody. He taught me that I should never run from anyone, no matter who they were.

16. I knew the Hill family because James Hill is my sister's father. The Hills were never violent. Additionally, they could not have been following Henry in a car, because the only one who ever had a car was Billy. Joe and James were always walking or taking

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

the bus. I saw them every day. I had also never seen them violent. They wouldn't carry so much as a pocketknife.

17. I knew that Henry informed on others to help himself. He got arrested many times and did very little time. When I heard that he had robbed a bank and gotten probation, I knew that he had to have informed on somebody.

18. I knew Marcellus somewhat when we were growing up. We never hung out together or went out together, because I am much younger than Marcellus.

19. Marcellus has never been a violent person. I am certain that he is not good for the crime for which he was convicted. When I found out that Henry was going to testify falsely against Marcellus, I could not believe it. Even though I know how mean and crazy he was, I never wanted to believe that he would make up lies on someone and take someone's life just for money and to get off probation.

20. Marcellus' attorneys never contacted me. I was ready, willing, and available to speak to his attorneys, to provide him with the information contained in this Affidavit, and testify to the same information if called to testify at Marcellus' trial;

21. At this time, I am also ready, willing, and available to testify at Marcellus' PCR or any other proceeding and will testify to all of the information contained herein.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

22.  Further, Affiant sayeth naught.

DURWIN COLE

SUBSCRIBED and SWORN to before me this 21st day of August, 2003.

NOTARY PUBLIC

SHERRY L. BREWER
Notary Public - Notary Seal
State of Missouri
County of St. Francois
My Commission Exp. 06/18/2007

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 6
*Ronnie Cole Affidavit*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

**IN THE CIRCUIT COURT IN AND FOR THE COUNTY OF ST. LOUIS
STATE OF MISSOURI**

| | |
|---|---|
| **MARCELLUS WILLIAMS,** | ) |
| | ) |
| **Movant,** | ) |
| | ) PCR No. _____ |
| **v.** | ) |
| | ) Division No. 11 |
| **STATE OF MISSOURI,** | ) |
| | ) Hon. Emmett O'Brien, Judge |
| **Respondent.** | ) |

| | |
|---|---|
| **STATE OF MISSOURI** | ) |
| | ) ss |
| **COUNTY OF COLE** | ) |

## AFFIDAVIT

I, Ronnie Cole, being first duly sworn upon oath, do depose and state as follows:

1. I am currently incarcerated in the Missouri State Penitentiary in Jefferson City, Missouri;

2. Henry Cole is my maternal uncle. Dexine Gibson is my mother, Henry Cole's sister;

3. I have known and been around Henry Cole all of my life. He lived with my mother most of the time when I lived there;

4. When I lived with Henry, he had severe mood swings. If he wanted something and someone was not willing to provide him with it, he went off on them, sometimes

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

messing up their automobiles or being assaultive towards them. He was always violent, particularly when he was on drugs;

5. I know that Henry used drugs because he often bought them from me. He used heroin, crack cocaine, and PCP;

6. I learned at a young age not to mess with Henry because he is not right. He cares about no one or nothing and everything he has ever done has been hurtful to my family;

7. When my grandmother was alive, she tried her best to take care of Henry. She tried to give him whatever he needed. After she died, he was on his own and would do anything to get money;

8. Henry stayed with my mother after my grandmother died. My mother, Dexine, and Henry did not get along, but she allowed him to stay there because she was afraid of him. He was violent and unpredictable. She has no control over him. I believe that Henry had assaulted her in the past as well. My mother is not a streetwise person and did not know how to handle Henry other than letting him stay there and staying out of his way. She knew, however, that he would do anything for money and believes that Henry made up much of what he testified to at Marcellus' trial and that he did it solely for the money.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

9. My brother, Durwin Cole, has always been the protector of my family. As he is currently in the St. Louis City workhouse, my mother has no one to protect her from Henry;

10. No one in my family except my grandmother wanted anything to do with Henry. Family means nothing to Henry since my grandmother passed away. Even when he lived with my family, we seldom had a conversation unless he was looking for drugs or looking to unload loot that he obtained from burglarizing homes. On one occasion, I purchased a gun from him;

11. Henry has always been a liar and not a reliable person. He lies to get whatever he needs to satisfy his personal needs. Whenever he can't find a good scam or someone to lean on, he leaves town. He knows that he is going to probably die of AIDS and he does not care who he takes with him;

12. I knew Marcellus somewhat when we were growing up. I would see him off and on because his niece is my sister, Coco. We never hung out together or went out together. We ran into each other again in the early 1990's at the Missouri Eastern Correctional Center in Pacific, Missouri;

13. I talked to Marcellus again when we were both incarcerated in the Missouri State Penitentiary after he was convicted of robbery. I talked to him about Henry Cole and he told me that his attorneys would be interviewing me. They never contacted me;

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

14. At that time, I was ready, willing, and available to speak to his attorneys, to provide him with the information contained in this Affidavit, and testify to the same information if called to testify at Marcellus' trial;

15. At this time, I am also ready, willing, and available to testify at Marcellus' PCR or any other proceeding and will testify to all of the information contained herein.

16. Further, Affiant sayeth naught.

_____
RONNIE COLE

SUBSCRIBED and SWORN to before me this 12th day of August, 2003.

_____
NOTARY PUBLIC

JEANNETTA ELLIOTT
Notary Public - Notary Seal
State of Missouri
County of Callaway
My Commission Exp. 01/09/2007

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 7
*Edward Hopson Affidavit*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

**IN THE CIRCUIT COURT IN AND FOR THE COUNTY OF ST. LOUIS STATE OF MISSOURI**

| | |
|---|---|
| **MARCELLUS WILLIAMS,** | ) |
| | ) |
| **Movant,** | ) |
| | ) PCR No. _____ |
| **v.** | ) |
| | ) Division No. 11 |
| **STATE OF MISSOURI,** | ) |
| | ) Hon. Emmett O'Brien, Judge |
| **Respondent.** | ) |

| | |
|---|---|
| **STATE OF MISSOURI** | ) |
| | ) ss |
| **COUNTY OF PIKE** | ) |

**AFFIDAVIT**

I, Edward Hopson, being first duly sworn upon oath, do depose and state as follows:

1. I currently reside at the Northeastern Correctional Center in Bowling Green, Missouri.

2. I have know Laura Asaro since she was about eight years old

3. My father, James Napoleon Jones, was married to Betty Asaro Jones, Laura Asaro's grandmother.

4. Later, I got together with Laura's mother, Cynthia Asaro, and we were together

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

about ten years. During that time, I got to know Laura very well.

5. Laura is a deceitful, mean, destructive liar. She is a drug addict and will do anything to get a rock of cocaine. She will have sex with anyone for drugs and will use anyone, including her own family, to obtain drugs. She has had sex with many young boys in the neighborhood for drugs or money. She had sex with me on two occasions. She had sex with my son in exchange for a rock. She also had sex with my father.

6. She has had sex with many members of the St. Louis Police Department for drugs or money. She cultivated a tight relationship with the police officers and when they needed her to be an informant, she would say whatever they wanted her to say.

7. Every since she was very young, she has been a prostitute. Danny Chaney, the father of two of Laura's children, put her out on the streets when she was a teenager.

8. On one occasion, Laura was arrested for prostitution. She took her young son out of school so that he could go to court and provide her with a false alibi. I went to court with her so that if her scam didn't work and she went to jail, I would be able to take her son back home.

9. I have also known that Laura has been a paid informant for years. All the police officers on the South Side know her. They joke with her about arresting her and she just laughs at them. They leave her alone.

10. Laura is a known police informant. On one occasion, I personally observed her informing on two guys. Laura sent a fellow prostitute to find me and told me that

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Laura had been beat up and needed some help. Cynthia, Laura's mother, had told me to leave her alone, even if she had been beaten or shot at because she was nothing but trouble. Despite Cynthia's warnings, I went to make sure that Laura was okay. There was nothing wrong with Laura. She was in the drug house. While I was there, the police arrived. Laura pointed out two guys and the police took one of them away.

11. I tried my best to take care of Cynthia, Laura, and Laura's children. Cynthia had custody of the children because of Laura's drug use, sexual behavior and neglect and abandonment of her kids. Despite her behavior, Cynthia still let Laura come to visit. She told me, however, not to let Laura in the when she was not around, because Laura might try to pull something on me.

12. Laura's behavior when she was around was outrageous. On one occasion, I find her watching pornographic movies with the children. She taught her daughter to act just like her. On more than one occasion, the school called to say that Laura's daughter, Ashley, had been inappropriately touching the buttocks of boys in the school. On another occasion, Cynthia and I caught Ashley performing oral sex on her brother, Manuel.

13. I am also aware that Laura has falsely accused men of rape and had them thrown in jail.

14. Laura did not like the fact that I was staying with her mother, since Laura could not manipulate Cynthia while I was there. Everyone in my family and Cynthia's warned me that I should get out of the house because Laura would do something to me. I

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

loved this family and wanted to help them. Eventually, Laura convinced her daughter to falsely accuse me of have sex with her. That was never true. I have never and would never had sex with children. I was accused of this crime solely to get me out of the house so that Laura could do whatever she wanted in her mother's home. Cynthia knew that I was not guilty of this crime. Detectives from the St. Louis Police Department that were associates of Laura's threatened to take the children away Cynthia if she did not cooperate with the prosecution against me.

15. Prior to the time that Laura testified against Marcellus, the police were coming by the house looking for her frequently. I went to the V.A. hospital at Jefferson Barracks for alcohol treatment during this period of time. I was constantly in contact with the neighbor, Colleen Bailey. She advised me that Laura talked to her about her upcoming testimony. She was looking forward to testifying in the case because she was anticipating receiving a substantial amount of money for her testimony.

16. Further, affiant sayeth naught.

_Edward Hopson_
EDWARD HOPSON


SUBSCRIBED and SWORN to before me this 20th day of August, 2003.

NOTARY PUBLIC

CHADRA HARTEGAN
Notary Public – Notary Seal
STATE OF MISSOURI
Marion County
My Commission Expires: Oct. 1, 2004

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 8
*Walter Hill Affidavit*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

IN THE CIRCUIT COURT IN AND FOR THE COUNTY OF ST. LOUIS

STATE OF MISSOURI

| | | |
|---|---|---|
| MARCELLUS WILLIAMS, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | PCR No. 03CC-2254 |
| v. | ) | |
| | ) | Div. 11 |
| | ) | |
| | ) | Hon. Emmett O'Brien, Judge |
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent. | ) | |

| | | |
|---|---|---|
| STATE OF MISSOURI | ) | |
| | ) | SS. |
| COUNTY OF ST. LOUIS | ) | |

## AFFIDAVIT

I, Walter Hill, being first duly sworn upon oath, do depose and state as follows:

1. I am Marcellus Williams' maternal grandfather. I currently reside at 4940 Emerson, St. Louis, Missouri.

2. I was not called to testify in either the guilt or penalty phases of Marcellus' trial even though I had personal knowledge of information about Marcellus' family, his life, his behavior around the time of the charged crime, and the behavior of Laura Asaro, Marcellus' one-time girlfriend.

3. Had I been called in the guilt and/or penalty phases of Marcellus' trial, I was ready, willing, and available to provide the following information to the jury and I am ready, willing, and available to provide the same information to the court at the evidentiary hearing.

1

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

4. While Marcellus was incarcerated at the St. Louis City Workhouse, Laura Asaro was the only individual who had keys to Marcellus' car. I asked her to give me the keys because I wanted to move the car. Ms. Asaro called me and told me she would bring me the keys so the car could be moved from the front of my house to the side yard, but she never showed up. Consequently, my son James Hill, and a neighbor, Theon Shear, pushed the car into the vacant lot next to my house.

5. I was aware of the problems that Marcellus had with the car because I was the previous owner. I sold the car to him in mid to late July, 1998. At the time of the purchase, I told Marcellus that the car needed a timing set, but he was unable to purchase and install one before the car stopped running. Since Marcellus was unable to get a timing set, the carburetor malfunctioned making the car totally inoperable. The car stopped running a few days after I sold it to him, and the car has been inoperable ever since.

6. In October or November 1999, some police officers police came to my home. They claimed they had information that drugs were being dealt from my home. I consented to them searching Marcellus' car which was parked in my side yard. The trunk was locked and Laura Asaro had the only set of kets. Joseph Hill had to punch in the lock so the officers could search the trunk. Also present were Joseph Hill, Glenn Roberts, and Latonia Hill, and me.

7. I moved my family to St. Louis from South Bend, Indiana in the early 1970's. My wife, Mattie Louise Hill, and I first got an apartment near the Hodiamont tracks at Euclid and Fountain, and numerous family members lived in that small, roach-infested space. Marcellus lived there, while his mother, Ella, and his brother, Dan, remained in Indiana. I then bought a house on Emerson Avenue in Walnut Park, a neighborhood that was racially integrated and safe for the children when we first moved there. The neighborhood experienced a steep economic decline in the late 1970's and 1980's, resulting in a visible presence of drugs and guns. We knew of neighbors being shot and killed. Ella moved her family in with us when Marcellus was in the third grade, and there were not enough beds for everyone. We have helped our family whenever we could.

8. I admit that I spoiled Ella as a child. She banged her head on the floor to get what she wanted. I used to borrow money to buy her things. Ella took all her clothes off in public as a seven- and eight-year-old, and was beaten to stop this behavior. I admit I was a harsh disciplinarian. I believed in harsh punishment. My own father had beaten me with the razor strap. When my own children came along, I used the same type of corporal punishment. I had a number of disputes with my youngest son, David. David became involved in criminal activity, and Marcellus was exposed to this as a child and teenager. Some of my sons were addicted to drugs, and Marcellus was exposed to this as well.

2

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

9. My wife, Mattie Lousie Hill, died of cancer in 1987. I was lost when she died. I couldn't pay the bills, or manage things around the house. Everyone grieved terribly when she died, because she kept the family together.

10. Marcellus never had a relationship with his father, Rayford Daniels, although he longed to know him and that part of his family.

11. Some of my sons continue to struggle with alcohol or drug addictions. My family has had many financial problems over the years. Most of my children did not graduate from high school. I only went through the seventh grade, and my wife graduated from high school. I was a laborer all my working life, and my wife worked cleaning houses and cooking.

_Walter Hill_
WALTER HILL

SUBSCRIBED TO AND SWORN before me this _12th_ day of March, 2004.

"NOTARY SEAL"
Catherine L. Luebbering, Notary Public
St. Louis City, State of Missouri
My Commission Expires 6/18/2007

_Catherine L. Luebbering_
NOTARY PUBLIC

3

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 9
*Latonya Hill Affidavit*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

IN THE CIRCUIT COURT IN AND FOR THE COUNTY OF ST. LOUIS

STATE OF MISSOURI

MARCELLUS WILLIAMS, )
)
Movant, )
) PCR No. 03CC-2254
v. )
) Div. 11
)
) Hon. Emmett O'Brien, Judge
STATE OF MISSOURI, )
)
Respondent. )


STATE OF MISSOURI )
) SS.
COUNTY OF ST. LOUIS )


## AFFIDAVIT

I, Latonya Hill, being first duly sworn upon oath, do depose and state as follows:

1. I am Marcellus William's first cousin. My mother, Queen Hill, and his mother, Ella Williams Alexander, are sisters. I currently reside at 5070 Ruskin, St. Louis, Missouri.

2. I testified during the guilt phase of Marcellus' trial. I was never asked to provide mitigating evidence for Marcellus or called to testify during the penalty phase. If I had been interviewed about mitigation and requested to testify during penalty phase, I was ready, willing and available to testify during the penalty phase. I am also ready, willing, and available to testify at Marcellus' evidentiary hearing.

3. If requested to, I would have testified to the following information:

4. I am Marcellus' first cousin, and lived with my mother and brother in my maternal grandparents' home as a child. My grandfather is Walter Hill and my

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

grandmother was Mattie Hill. There was some conflict in my grandparents' home when I was growing up.

5. Marcellus and all the family have known that my grandfather was very abusive to my grandmother, and he mistreated her both verbally and physically. My uncles used to intervene when my grandfather was treating my grandmother this way. Some of my uncles have been in abusive relationships. My aunt Patty has been in abusive relationships. I have seen my cousin Jimmy push his girlfriend down some stairs. The abusive patterns in my family have sometimes included men being victimized. Marcellus saw some of this conflict. I was closer to Marcellus when we were younger. When we saw each other as adults, he would always ask about me and my family, and offer me support.

6. I also had additional information that I would have provided in the guilt phase of trial had Marcellus' trial attorneys requested it. I was aware that Marcellus had been arrested for a city ordinance violation in early August, 1998. A few days after he was released from the Central Jail in downtown St. Louis, he had to borrow my car to pick up Laura Asaro from South St. Louis City because his car was inoperable.

7. Additionally, I was present at my grandfather's (Walter Hill's) house when the police came to his house in October or November, 1998. They claimed that they had been given a tip that drugs were being sold in his home. Walter gave them permission to search Marcellus' car. The trunk was locked and Joseph Hill had to punch in the lock so the officers could search the trunk. Also present were Walter Hill, Joseph Hill, and Glenn Roberts.

_____
LATONYA HILL

SUBSCRIBED TO AND SWORN before me this 28th day of May, 2004.

NOTARY SEAL
Catherine L. Luebbering, Notary Public
St. Louis City, State of Missouri
My Commission Expires 6/18/2007

_____
NOTARY PUBLIC

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 10
*Joseph Green Affidavit*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

IN THE CIRCUIT COURT IN AND FOR THE COUNTY OF ST. LOUIS

STATE OF MISSOURI

MARCELLUS WILLIAMS, )
)
Movant, )
) PCR No. 03CC-2254
v. )
) Div. 11
)
) Hon. Emmett O'Brien, Judge
STATE OF MISSOURI, )
)
Respondent. )

STATE OF MISSOURI )
) SS
COUNTY OF ST. CHARLES )

## AFFIDAVIT

I, Joseph Libory Green, being first duly sworn upon oath, do depose and state as follows:

1. I am attorney, duly licensed to practice in the state of Missouri since 1988;

2. My first job as an attorney was with the Missouri State Public Defender in St. Joseph, Missouri. I later worked in the St. Louis County Public Defender's Office and with the Capital Litigation Office of Eastern Missouri in St. Louis;

3. After leaving the Missouri Public Defender's Office in, I became an associate in the law firm of Wittner, Poger, and Rosenblum in Clayton, Missouri. From there I went into solo private practice for a year, and then formed the partnership with my current law practice;

4. Since leaving the Missouri Public Defender's Office, I have handled a variety of types of cases, including civil, federal, freedom of speech, civil rights, capital murder, personal injury, civil defense, contracts, and others;

826

1

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

5. I testified at Marcellus' postconviction evidentiary hearing on March 12, 2004. I had been given an opportunity to review Marcellus' amended motion prior to my testimony. Per Court Order, I was restricted to testifying about the allegations made in 8(q) and 9(q) of Marcellus' amended motion. If I had been permitted to testify about issues raised in the remaining allegations of the amended motion, I was ready, willing, and available, and would have testified under oath to the following information.

6. I was originally contacted by Barbara Hoppe, transfer attorney of the Missouri State Public Defender, who asked me whether I was willing to represent Marcellus Williams at trial. After I agreed, Chris McGraugh was also appointed to the case. Chris and I have tried capital murder cases together in the past. It is our general practice when we do cases together that I usually do the penalty phase because I have more experience in preparing and presenting penalty phase evidence to the jury.

7. Although we divided the case along guilt phase/penalty phase lines, we both participated in the investigation and preparation for both phases of trial. Additionally, we made all strategy decisions regarding both phases together.

8. Prior to trial, I was very interested in finding out everything we could about the state's snitches, Henry Cole, and Laura Asaro. All of the documents that we received from the State which contained a list of potential witnesses for trial contained only the prosecuting attorney's office as contact information for both Henry Cole and Laura Asaro. We filed numerous documents in an effort to obtain the whereabouts of Henry Cole and Laura Asaro so that we could depose them prior to trial. A month before trial, we were finally able to depose both Henry Cole and Laura Asaro.

9. Based on the depositions, we learned a number of things about Henry Cole and Laura Asaro that required further investigation. Mr. Cole testified that he had witnessed a murder. He testified that he had collected SSI disability for several years. He had been treated by a psychiatrist and prescribed anti-depressant medication. Both Ms. Asaro and Mr. Cole admitted to having problems with drugs and/or alcohol and had been treated for their addictions several times over the years. Ms. Asaro had given conflicting accounts of her mental health history. She had seen a psychiatrist on at least one occasion and had applied for social security disability because of emotional problems.

827

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

10. All of these areas of investigation were critical to the credibility of the witnesses and consequently, critical to Marcellus' case, because they were the only witnesses who could connect Marcellus with the charged crime.

11. We filed a motion for continuance because we needed time to investigate things we learned about during the depositions. We did not have records from the numerous times and different jurisdictions that Mr. Cole was incarcerated. We were thwarted from getting medical records, benefit records, and probation records because the state advised Mr. Cole not to sign authorizations for release of those records to us. The State still had not disclosed correspondence between the State and Mr. Cole, additional handwritten evidence made by Mr. Cole during his videotaped statement, records of calls between Mr. Cole and the University City Police and payment records from the University City Police Department to Cole. We were attempting to get the State to disclose this evidence while also investigating scientific evidence involving DNA, and while I tried the death penalty case of State v. Baumruk, which started on May 7, 2001. The verified motion for continuance was denied.

12. We filed numerous requests for discovery. We failed to move to compel discovery and disclosure of most of the information that we had previously sought. The State finally complied with our requests for the arrest and conviction records of the snitches three days before trial.

13. I knew that Henry Cole was the most damaging witness that the State had in its case against Marcellus. We had deposed Cole on two different occasions and knew that he would present detailed information about the murder of Felicia Gayle that he purportedly received from Marcellus. We also knew that in order to effectively present Marcellus' theory of actual innocence to the jury, we had to discredit Cole with relevant, credible evidence that he was untrustworthy and that the jury should discount his testimony entirely.

14. Marcellus had provided us with information about some of Mr. Cole's family members and indicated that they could provide information about Mr. Cole that may be used for impeachment. Marcellus advised us on numerous occasions, both in person and by mail, that he wanted us, or our investigator to interview Henry Cole's son, Johnifer Griffin Cole, his sister, and Dexine Cole, his niece.

15. Marcellus advised us that the Cole family members had personal knowledge of Cole's character and his propensity to lie. Marcellus advised us that Johnifer and Ronnie were incarcerated at the Jefferson City Correctional

828

3

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Center, and that all of these individuals were ready, willing, and available to be interviewed and testify at trial. We did not personally investigate Henry Cole's family members. Failure to investigate Cole's family was not a matter of trial strategy. Had we interviewed Johnifer, Bridget, and Ronnie,; I believe we could have located Henry Cole's nephew, Durwin Cole. We simply ran out of time.

16. Had we investigated Henry Cole's family members and learned the information contained within their affidavits, I would have presented their testimony in guilt phase to impeach Henry Cole's credibility. Their testimonies were important because they were consistent with our theory of defense. From their personal knowledge they knew that Henry Cole would do or say anything for money. I also believe that had the jury found Marcellus guilty of first degree murder despite their testimony, their testimony would have been helpful to the residual doubt theory in penalty phase.

17. I also believe their testimony would have been extremely helpful in that they had personal knowledge that for a number of years, Henry Cole exhibited behavior that was consistent with someone who was mentally ill, and that any testimony he proffered at Marcellus' trial would not be reliable.

18. Had we leaned that Henry Cole exhibited behavior that was consistent with mental illness, I would have filed a motion requesting a Court ordered psychiatric examination to determine whether Henry Cole was competent to testify. I would have also wanted a defense expert such as Dr. Cross or a similarly qualified expert to examine Henry Cole to determine if he had any mental illness that would make him an unreliable witness. Had I known about the information in Dr. Cross' affidavit concerning Henry Cole' mental illnesses, I would have presented such evidence to the jury in guilt phase to impeach Henry Cole's credibility. I believe information relevant to Henry Cole's psychiatric disorders, his possible antisocial personality disorder, or mental illness was crucial to Marcellus's guilt phase defense because Marcellus has a Sixth Amendment right to confront his accuser.

19. Had the court granted a psychiatric examination for Henry Cole, we would have had access to Cole's prior psychiatric records, which the State would not give us, and informed Henry Cole that he did not have to sign a consent form so that we could send for them. Prior to trial, we believed that Henry Cole may have suffered from some type of mental illness, but had no records or testimony from individuals who observed his behavior. That is why we tried without success to get Henry Cole's medical and psychiatric records. I had no strategic

829

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

reason for failing to contact Henry Cole's family member who could have also given us some insight into Henry Cole's mental disorders.

20. Marcellus filed a Motion for an Actual Conflict of Interest with the Court because he believed Chris and I were not handling his case effectively, I believe that the Court had a duty to conduct a hearing on the motion. The Court was aware, due to our motions for continuance that we had not had sufficient time to effectively investigate Marcellus' case. Had such a hearing been conducted, I would have reiterated to the Court that I had not fully investigated Marcellus' case because of the State's late disclosures of discovery material, my own participation in the Baumrauk trial, which had been completed shortly before the state of Marcellus trial, and because I had only recently learned information from Henry Cole and Laura Asaro's depositions that needed investigation.

21. Two days after Marcellus filed his Pro Se Motion for an Actual Conflict on Interest , I filed a Supplemental Verified Motion For Continuance. I argued that Marcellus would be prejudiced if we did not get more time to investigate the evidence and discovery presented by the State within the last two months, investigate statements allegedly made by Marcellus, investigate the aggravating circumstances, investigate and present mitigating circumstances on Marcellus' behalf, and have more time so that trial counsel would have an opportunity to effectively prepare for trial. While I believed that we needed more time to adequately investigate Marcellus valid concerns, we did not insist that Marcellus' Conflict of Interest Motion be heard by the court and preserve the issue for appellate review. I believe this was an important issue for appeal and we should have had a hearing on Marcellus' concerns. Failure to request such a hearing was not a matter of trial strategy.

22. I was aware that physical evidence had been collected at the crime scene. I was also aware that none of the physical evidence linked Marcellus to the crime. Mr. McGraugh and I had hired Jami Harman and Victor Granat to analyze the crime scene evidence and compare it to known suspects. I believed that Laura Asaro was an active participant in the crime. I knew that Ms. Asaro had not been ruled out as a suspect. After the police zeroed in on Marcellus as a suspect, they looked no further. They did not look at the possibility that Ms. Asaro and one of her boyfriends committed this crime. I knew that witnesses had provided information that Ms. Asaro had the stolen laptop computer in her possession.

23. I was working on Kenneth Baumrauk's case at the same time as Marcellus' and in fact tried the case two weeks before Marcellus' trial. I had

830

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

complete responsibility for preparing and presenting Mr. Baumruk's case for a Competency Hearing conducted on September 25 – 27, 2000, and October 19, 2000. I was also responsible for preparing for cross-examination of the State's ten expert and lay witnesses, as well as consulting with and presenting the testimony of three defense expert witnesses. I was penalty phase counsel for Mr. Baumruk's trial, which was conducted on May 7-14, 2001. I had to prepare for trial during the same time period that I was preparing for Marcellus' trial.

24. The trial judge denied our motion for continuance and I did not have sufficient time to thoroughly prepare for Marcellus' trial.

25. Our theory of defense for penalty phase was residual doubt. We hoped that, although the jury had found Marcellus guilty beyond a reasonable doubt of murder in the first degree, that they we could provide them with a lingering doubt that would encourage them to vote for a life without parole sentence. Consequently, any information that applied to the guilt phase of trial could equally apply to the penalty phase.

26. While working for the Missouri Public Defenders' Office in the Capital Litigation Division, I attended numerous seminars and trial workshops to train me to prepare for and conduct capital murder trials. I attended approximately three or four a year. The training pertained to pre-trial matters, voir dire, guilt/innocence phase issues and penalty phase issues;

27. I was trained on the proper way to conduct a social history investigation. A social history includes everything that can be discovered about a person;

28. In a capital case, I want to know everything I can about my client's social history, including where they were born, their family history, where they attended school, what medical problems that had growing up, what dysfunction, if any, they had in their family, etc. This information needs to be corroborated with family members and documents.

29. It is critical to get a complete social history prior to deciding guilt and penalty phase strategies. With respect to guilt phase, there are things that you can learn from somebody's social history that may trigger a defense, particularly in a capital case where it is a specific intent crime. For example, diminished capacity may be available if the client suffers from a serious mental disease or defense which affected his/her behavior on the night of the crime, and DNA may be used to show genetic traits which are unique to a client's family. The primary focus in my

831

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

practice for the social history is for penalty phase, because it can develop both statutory and non-statutory mitigating circumstances.

30. Prior to the postconviction evidentiary hearing, I had an opportunity to review Marcellus' social history prepared by mitigation specialist, Catherine Luebbering, and a report prepared by Donald Cross, Ph.D who had reviewed numerous documents including but not limited to a complete social history. Dr. Cross interviewed Marcellus on several occasions, nine of his family members, and a family friend. He administered several psychological tests that confirmed his conclusions about Marcellus' life-long mental disorders.

31. Dr. Cross explained that Marcellus suffers from Post-Traumatic Stress Disorder as a result of childhood trauma, adolescent depression, alcohol dependence, marijuana abuse, and cocaine dependence. Dr. Cross also discussed how Marcellus' mental disease or defect affected his decisions to be involved in criminal conduct that the state used as statutory aggravating circumstances which the jury used to sentence him to death. Had I obtained a diagnosis that Dr. Cross came up with during the postconviction case, I would have put this evidence on at trial. This evidence would have been important to Marcellus' penalty phase defense in that it would have provided explanations for his prior criminal history.

32. Additionally, although our theory of defense was actual innocence, if we reached a penalty phase, the jury would have already decided that they believe Marcellus was guilty, and such evidence would have given the jury a more sympathetic picture of Marcellus than the facts surrounding the crime. I understand that presenting such evidence may have resulted in Marcellus' prison conduct becoming an issue, but this would not have been a reason not to present such evidence in penalty phase because the jury had already learned about Marcellus' conduct while he was incarcerated during the guilt phase.

34. The jury heard a tremendous amount of aggravating evidence without any testimony from Marcellus or explanation from an expert. We would have presented the testimony of Marcellus' family members who could have laid the foundation for Dr. Cross' testimony or a similarly qualified expert.

35. We ran out of time because of problems we were having getting discovery from the State and, my inability to work on Marcellus' case because of

832

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

my obligations in <u>State of Missouri v. Kenneth Baumruk</u>. I believe testimony like Dr. Cross' would have been very mitigating and could have saved Marcellus' life.

36. Further, Affidant sayeth naught.

_____
Joseph Libory Green

SUBSCRIBED to and SWORN before me this __28th__ Day of May, 2004.

_____
NOTARY PUBLIC

" NOTARY SEAL "
Kelly O. Padgitt, Notary Public
St. Louis County, State of Missouri
My Commission Expires 3/17/2006

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 11

*Letter to Robert McCulloch Re: DNA Testing*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# Law Office of
# KENT GIPSON, LLC

121 East Gregory Boulevard
Kansas City, Missouri 64114

816-363-4400 • Fax 816-363-4300
kent.gipson@kentgipsonlaw.com

December 19, 2014

**VIA FACSIMILE 314-615-3895**

Robert McCullough
St. Louis County Circuit Attorney
100 South Central
Clayton, MO 63105

RE: Marcellus Williams, 99CR-5297

Dear Mr. McCullough:

Myself and St. Louis Area attorney Laurence Komp are CJA appointed counsel for Mr. Williams. As you may or may not be aware, earlier this week the Missouri Supreme Court set Mr. Williams' execution for January 28, 2015. Given the fact that the evidence of his guilt is in doubt, I am writing to request that you agree to run the DNA profiles obtained from trace evidence collected at the crime scene, including hairs and fingernail scrapings, through the state and CODIS databases to see if a match can be obtained. I would also urge you to agree to DNA testing of any hair or other trace evidence that has not been previously tested.

We strongly believe that these are reasonable requests given the gravity of the punishment involved and the interests of justice. Should a match come up in either of these databases, such a development would provide a strong case that an innocent man has been condemned to die and would obviously justify further judicial review or clemency from the Governor.

I enclose a copy of a motion we filed in the Missouri Supreme Court that briefly and generally discusses the issues regarding this DNA evidence. I would appreciate it if you would give this matter your immediate attention and let me know your position on this issue by December 31, 2014. If we do not have a positive answer by then, we intend to pursue these matters through the judicial process.

Sincerely,

Kent E. Gipson
Attorney for Marcellus Williams

KEG:psk
Enclosures



Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 12
*2001 Judgment and Sentence*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

STATE OF MISSOURI   )    IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
                 )SS
COUNTY OF ST. LOUIS )   MISSOURI.   DIVISION: 11

AUGUST 27, 2001

STATE OF MISSOURI         PLAINTIFF )
                       )
vs  99CR-005297   (5)        )  JUDGMENT AND SENTENCE
                       )
MARCELLOS WILLIAMS     DEFENDANT )
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
12/30/1969

Now at this day comes the State of Missouri by the Assistant Prosecuting Attorney, Keith Scott Larner, and the Defendant in person and by counsel, Joseph Green and Christopher McGraugh. On June 15, 2001, Defendant was found Guilty by a Jury of the offense(s), Count 1: Burglary First Degree, a Class B Felony, committed on August 11, 1998; Count 3: Armed Criminal Action, a Felony, committed on August 11, 1998; Count 4: Robbery First Degree, a Class A Felony, committed on August 11, 1998; Count 5: Armed Criminal Action, a Felony, committed on August 11, 1998. Accordingly, the Defendant is adjudicated guilty of the offense(s) charged. The Defendant now comes before the Court for sentencing.

Evidence was presented on June 4, 2001, that the Defendant has previously pled guilty to or has been found guilty of two or more felonies committed at different times. The Court finds beyond a reasonable doubt that the Defendant is a Persistent Offender pursuant to §558.016 RSMo. and, as such, is subject to an extended term of imprisonment.

The Defendant having no legal cause to show why judgment and sentence of this Court should not now be pronounced, the Defendant is sentenced to serve an extended term of imprisonment of Thirty (30) Years, in the custody of the Missouri Department of Corrections, for the offense(s), Count 1, and a consecutive term of imprisonment of Thirty (30) Years, for the offense(s), Count 3; and a consecutive term of Life Imprisonment, for the offense(s), Count 4, and a consecutive term of imprisonment of Thirty (30) Years, for the offense(s), Count 5; to run consecutive to 00CR-2972.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Therefore, the Defendant, having previously been found to be a Persistent Offender pursuant to §558.016 RSMo., it is ordered and adjudged by the Court that said Defendant be and is hereby committed to the custody of the Missouri Department of Corrections, for an extended period of imprisonment of Thirty (30) Years, for the offense(s), Count 1; and a consecutive period of imprisonment of Thirty (30) Years, for the offense(s), Count 3; and a consecutive period of Life Imprisonment, for the offense(s), Count 4; and a consecutive period of imprisonment of Thirty (30) Years, for the offense(s), Count 5; to run consecutive to 00CR-2972; and that Defendant stand so committed until this sentence is complied with or Defendant be otherwise discharged according to law.   State ordered to pay Court costs.   Defendant advised and examined pursuant to Rule 29.07.

Pursuant to the Crime Victims' Compensation Act, the Court orders, adjudges and decrees that a judgment in the amount of $68.00 be entered against the Defendant in favor of the State of Missouri.

_____
Judge Emmett M. O'Brien

I certify and attest that the above is a true copy of the original record of the Court in this case as it appears on file in my office.

ISSUED: _____AUG 2 9 2001_____

Joan M. Gilmer, Circuit Clerk

BY: _____
Deputy Clerk

(2)

99CR-005297    (5)

# EXHIBIT 13
*Excerpts from Henry Cole Deposition*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Case: 4:15-cv-00070-RWS    Doc. #: 1-2    Filed: 01/12/15    Page: 66 of 85 PageID #: 133

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

1

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS

STATE OF MISSOURI

STATE OF MISSOURI,                    )
                                      )
            Plaintiff,                )
                                      )
        vs.                           )   Cause No. 99CR-5297
                                      )
MARCELLUS WILLIAMS,                   )
                                      )
            Defendant.                )
------------------------------)

COPY

DEPOSITION OF HENRY LEE COLE

Bronx, New York

Monday, April 2, 2001

Reported by:
MARIA A. BERMUDEZ
JOB NO. 119796



ESQUIRE
DEPOSITION SERVICES

216 East 45th Street, 8th Floor
New York, NY 10017-3304
212.687.8010 • 800.662.3287
Fax 212.557.5972

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

8

Cole

A.    Well, I was there, which I'm there for a day or two.  I'll be released tomorrow.  So, I wasn't at my residence, so they found out through the residence where I was, which was one block away.

Q.    How did you get here today for this deposition?

A.    I was drove here.

Q.    You drove yourself?

A.    No.  Well, some officials from the hospital drove me here and they followed.

Q.    When you say "they followed," the prosecuting attorney followed you in the car that was driven by the hospital officials?

A.    Right.

Q.    From Lebanon?

A.    Right, from Bronx-Lebanon Hospital.

Q.    How long have you been a patient there?

A.    Just overnight.

Q.    Just overnight?

A.    Yes.

Q.    Were you admitted through the emergency or was this a preplanned appointment

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Cole

that you had with the hospital?

A.    Well, it was sort of like preplanned. I took myself, you know.  I went there voluntarily.

Q.    You admitted yourself voluntarily?

A.    Right.

Q.    Were you having some health problems or was this because of some other issues?

A.    Well, health problems -- I was going through -- well, I just felt like I needed some help for the time being, because I was going through a depression.

Q.    So, you were in a depressive state and you felt you needed to check yourself into a hospital?

A.    Right.

Q.    Do you have a regular physician that you consult with?

A.    Not there I don't.

Q.    You went there on your own accord? You didn't go there because you were advised to by any doctors; is that correct?

A.    No.  I went there on my own accord.

Q.    When you admitted yourself, did you

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Cole

admit yourself to the hospital through the emergency room of the hospital or did you --

A.     Right.

Q.     You did?

A.     Yes, I did.

Q.     And that was Saturday night?

A.     Yes.

Q.     Or Sunday?

A.     No, that was yesterday -- let me see, Friday night.

Q.     Friday night?

A.     Yes.

Q.     Do you know approximately what time you admitted yourself Friday night?

A.     I guess around 8:00, 8:30 that evening.

Q.     Was anybody with you when you admitted yourself?

A.     No.

Q.     You just admitted yourself by yourself?

A.     Myself.

Q.     Did you drive yourself to the hospital?

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

44

                            Cole

valve job on it -- not valve, temporary, because it started going tick, tick, tick, tick. He said it probably will hold up, but it will put the motor in worse shape. It'll take 350, 400 to get a temporary job, but I didn't have the money. So, I just went and got on a bus.

Q.    Who was the mechanic that told you this?

A.    Oh, he stayed across the street from where we lived at on Alcott, 4900 Alcott. They call him Papa Jack. His name is Roosevelt Jackson. He stayed across the street from Alcott. Mr. Jackson, he drives a school bus.

Q.    Where did you buy the bus ticket at to come to New York?

A.    Detective Dunn bought the bus ticket for me.

Q.    Do you know how much it cost?

A.    I'm not for certain. I believe it was 105 or 115. It was 105 or $115 one way.

Q.    What bus depot did you get off of when you came to New York?

A.    Port Authority, downtown, on 42nd and Eighth Avenue.

45

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Cole

Q.    Did she buy you a one-way ticket?

A.    One-way ticket.

Q.    Did you tell her where you were going to be staying at in New York?

A.    Nope, because I didn't know myself.  I told her I'd get in touch with her when I got here.

Q.    That was good enough for her?  She just bought you a ticket and said just contact me when you get to New York?

A.    Yes, because I was telling her about the incidents and I don't think -- she knew I wasn't lying.  There was an incident happening back to back and I was telling her family problems I was beginning to have.

Q.    What kinds of family problems were you beginning to have?

A.    You know, what certain families knew, Marcellus had told certain family members that I was snitching on him, stuff like that.

Q.    That was the extent of your family problems?

A.    Yes.  So, I just didn't feel comfortable down there, and I feel my life was in

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Cole

danger, too.

Q.   Did you have any other family members or friends here in New York that you felt like New York was a better place to go, as opposed to any place else?

A.   No.  I got a wife here in New York, an Italian girl.

Q.   What is her name?

A.   Maria Cole, but Maria Rose Scro is her name, and they live in Staten Island, New York, and me and her been divorced for years.

Q.   Are you and her divorced?

A.   I don't think so.  We separated.

Q.   When you got here to New York, did you contact her?

A.   No.  I was planning on contacting her recently, but I haven't contacted her since I been here.

Q.   Did you contact any other friends or acquaintances when you got here?

A.   No, I didn't.  I just got here and I figured that I could make it, you know, like working out of temp agencies and stuff like that, until I got on my feet.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

47

Cole

Q.    When you stayed at the shelters, did you apply for government assistance at all?

A.    Yes.

Q.    What offices did you apply for government assistance?

A.    Downtown, on 48th and Eighth Avenue, SSI.

Q.    SSI?

A.    Yes.

Q.    Did you qualify for SSI?

A.    Yes.

Q.    Did you have SSI when you were in Missouri?

A.    Yes, but I had got cut off.

Q.    How long did you have SSI when you were in Missouri?

A.    For about, I guess, about four years, off and on.

Q.    What offices did you apply for the SSI?

A.    Where?

Q.    In Missouri, what offices did you apply at?

A.    Out on Delmar, Delmar and DeBaliviere.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Cole

Q.    How much were you receiving in SSI?

A.    Well, in St. Louis I was receiving about 500 a month, 400 -- I think it was 490 something dollars a month and it got -- when I got here in New York and got accepted, you get expense, cost for living.  You get about $100 more, 600 a month.

Q.    In Missouri, when did you first make application for SSI?  Do you know what year?

A.    '84.

Q.    What were you getting --

A.    Not '84, sorry.  I'm getting my years messed up, around '94.

Q.    Was there an underlying disability that you were receiving SSI for that was found?

A.    Yes.

Q.    What was that disability?

A.    I was getting SSI for drugs and alcohol.

Q.    When you got it in 1994, how long did you continue to receive it?

A.    Up until the time -- during the time I got cut off is when I went to jail.  I was in and out of, you know, jails, and they cut you off

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

49

Cole

once you go to jail. When you get back out, you reapply.

Q.    So, in 1994 you received SSI for drugs; is that correct?

A.    Yes.

Q.    And then you went to jail. Did you go to jail sometime in 1994?

A.    Yes.

Q.    So, you didn't receive it for the full year of 1994, the SSI?

A.    No.

Q.    How long were you in jail?

A.    Just like for a few months or so. I got cut off. When I got back out, I reapplied.

Q.    Then did you reapply at the same office at Delmar and DeBaliviere?

A.    No.

Q.    What office?

A.    Because one time I applied, my mother's boyfriend took me in the county, because he said it was a quicker process.

Q.    Would that be Clayton?

A.    No, he took me in North County.

Q.    To Ferguson?

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

288

CERTIFICATE

STATE OF NEW YORK        )

                         : ss.

COUNTY OF BRONX          )

I, MARIA A. BERMUDEZ, a Notary Public within and for the State of New York, do hereby certify:

That HENRY LEE COLE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of April, 2001.

Maria A. Bermudez

_____

MARIA A. BERMUDEZ

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# EXHIBIT 14

*Excerpts from Laura Asaro Deposition*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS

STATE OF MISSOURI

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Plaintiff, | ) | |
| | ) | Cause No. 99CR-5297 |
| VS. | ) | |
| MARCELLUS WILLIAMS, | ) | |
| Defendant. | ) | |

DEPOSITION OF LAURA MARIE ASARO
TAKEN ON BEHALF OF THE DEFENDANT.

April 11, 2001

Reported By:  Carol Primo, CSR, CCR, RPR, RMR

PRIMO REPORTING SERVICE
Registered Merit Reporters
5438 Walsh Street
St. Louis, MO  63109
(314) 481-8616

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

procedure?

A.    I'm supposed to go the 17th back to talk to someone in surgery.

Q.    Okay.  And where is it that you're receiving treatment?

A.    From St. Louis ConnectCare on Delmar.

Q.    Okay.  Have you ever had any other health problems?

A.    No.

Q.    Okay.  Have you ever been hospitalized?

A.    Just for childbirth.

Q.    Have you ever been diagnosed or ever believed yourself to have a mental illness?

A.    No.

Q.    Okay.  And never received any treatment for a mental illness?

A.    No.

Q.    Okay.  And have you ever received treatment for drugs and alcohol?

A.    Yes.

Q.    And where did you receive treatment for drugs and alcohol?

A.    Well, I'm currently receiving it now.

Q.    Okay.  And where is that at?

A.    That's at New Beginning on Union and

18

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Natural Bridge.

Q.    And are you doing that as a condition of release, or are you doing that voluntarily, or--

A.    Both.

Q.    Okay.  And is that a condition of release from--

A.    From the workhouse.

Q.    From the workhouse.  And how long have you been in that program?

A.    It will be a month now.

Q.    Okay.  And how often do you attend that program?

A.    Monday through Friday.

Q.    Every day, five days a week?

A.    (Witness indicated by nodding her head.)

Q.    Okay.  And is there drug screening there?

A.    Yes.

Q.    Okay.  So you undergo, is it sporadic drug screening?

A.    Yes.

Q.    And have you had any dirty urines for that month?

A.    No.

Q.    Okay.  Dirty urines meaning that they

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

detected some type of narcotic in your system.

A.   I know what it means.

Q.   Okay.  Just so that we're clear that's what it means.  Prior to your treatment at New Beginning, have you undergone any other drug treatment?

A.   I went to Queen Of Peace in '92, I suppose.

Q.   And how long were you in that program?

A.   I guess a month.

Q.   Okay.  Did you successfully complete it?

A.   Yes.

Q.   Okay.  And prior to '92, were you in any type of drug treatment program?

A.   Yeah.  Or no.  I don't know.  I can't remember that far back like that.  I mean, I'm just going to basically be honest with you.

Q.   Okay.  So you can't remember anything past 1992?

A.   I mean, I can remember probably if I sit down and think about it, but I wasn't prepared to come and talk this much about myself today.

Q.   Well, as you sit here today, you can't recall what you did prior to '92 in drug treatment?

A.   Yes, I can recall.

20

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Q.    Well, that's what I'm asking.

A.    Okay.  Let me think which child.  '92.  We'll say '92 when I had Antonio.

Q.    Okay.  And you were in Queen Of Peace in '92?

A.    Right.

Q.    Okay.  Prior to '92?

A.    Nothing.

Q.    Nothing.  Okay.  Have you lived anywhere outside the state of Missouri?

A.    No.

Q.    Do you have any convictions for--do you have any convictions, criminal convictions?

A.    I have for drug possession--attempt drug possession.

Q.    And when was that?

A.    '94.

Q.    Okay.  What sentence did you receive for that?

A.    A hundred and twenty days.

Q.    So did you go to--

A.    I went to Boonville Treatment Center For Women.

Q.    Let me finish the question because I want to make sure that you're answering the question

21

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

I'm--you're anticipating what I'm asking, and so I want to make sure that the question that I'm asking is what you're answering; okay?

A.    Okay.

Q.    So you went to Boonville for the hundred and twenty days?

A.    Yes.

Q.    Okay.  Then were you placed on probation after Boonville?

A.    Yes.

Q.    Okay.  And how long of a probationary period were you placed on?

A.    Two years.

Q.    During that two years, were you ever--was there ever a petition to revoke your probation?

A.    Yes.

Q.    And what was that for?

A.    I suppose I used something.  I can't remember.

Q.    Did you maybe use narcotics during that period of time?

A.    I think I had a dirty urine.

Q.    Okay.  And did they send you back to prison?

22

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

A.   No.  The judge--I went somewhere.  I went to the workhouse.  And he dropped the charges.  And now I'm here.

Q.   You went to the workhouse?

A.   Right.

Q.   Okay.  And then you went back and the court then terminated your probation?

A.   Yes.

Q.   Okay.  And do you remember where that was?  Was that the city, or county, or--

A.   It was city.

Q.   City.  Okay.  Did you have any co-defendants in that case?

A.   No.

Q.   Okay.  Were you represented by the Public Defender's office?

A.   Yes.

Q.   Are you presently--you just stated that you are undergoing treatment right now as a condition of release.  What is the present charge that you're on?

A.   Prostitution.

Q.   Is that from the municipal courts down off of Olive?

A.   Uh-huh.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

STATE OF MISSOURI    )
                     ) SS
CITY OF ST. LOUIS    )

I, Carol Beth Primo, Registered Merit Reporter and Notary Public within and for the State of Missouri, do hereby certify that pursuant to agreement between counsel, came before me, on April 11, 2001, at the law offices of St. Louis County Prosecuting Attorney, 100 S. Central, in the County of St. Louis, State of Missouri, LAURA MARIE ASARO, who was by me first duly sworn on her oath to testify to the truth and nothing but the truth, of her knowledge touching and concerning the matters in controversy in this cause; that she was thereupon carefully examined upon her oath, and her examination transcribed into computer-assisted transcription under my supervision; that the deposition is a true record of the testimony given by the witness.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal this 17th day of April, 2001.

My commission expires March 14, 2005.

_____
Carol Beth Primo, Notary Public
within and for the City of
St. Louis, State of Missouri.

131